ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona
ERICA L. SEGER
Assistant U.S. Attorney
State Bar No: 022681
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone:  520-620-7300
Email: erica.seger@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>            Plaintiff,<br><br>    vs.<br><br>Uriel Gonzalez-Perez,<br><br>            Defendant. | CR 18-00033-TUC-JAS<br>CR 18-00230-TUC-JAS<br><br>GOVERNMENT'S SENTENCING MEMORANDUM |

Now comes the United States, by and through its undersigned attorneys, and submits the following sentencing memorandum in the above captioned cases.  Sentencing is scheduled for April 4, 2019.

**I.     GOVERNMENT'S CONCURRENCE WITH PSR GUIDELINE CALCULATIONS**

The government agrees with the guideline calculations in the PSR, dated October 15, 2018 and March 28, 2019.

**II.    BACKGROUND**

On November 29th, 2017, HSI Douglas agents were contacted by HSI Cleveland agents regarding the shipment of a package to Douglas, AZ.  The package contained 500, .50 Caliber Browning Machine Gun (BMG) M2 Links for a belt fed machine gun that was purchased from Ammunitionstore.com by the defendant.

The Browning M2, .50 caliber Machine Gun is an air-cooled, belt-fed machine gun. The M2 fires from a closed bolt, operated on the short recoil principle. The weapon is a military grade

weapon with a cyclical rate between 450-600 rounds per minute. The BMG is often vehicle mounted and used in ground and air defense applications. The BMG is on such a scale that the United States Military assigns three people to carry the BMG when it is deployed to the field in combat. The BMG is available on the open market in the United States in the semi-automatic version and runs between $7,000-$15,000 dollars in price. The .50 caliber links are the pieces that link the bullets to each other, allowing the weapon to have a consistent feed of ammunition. The links are connected to each other in long belts utilizing the .50 caliber bullet. The belts are then loaded into ammunition canisters in average amounts of 100 bullets, utilizing 100 links to make the belt.

The 500, .50 Caliber BMG M2 Links purchased by the defendant are on the prohibited export list per the Arms Export Control Act (AECA). Under the International Traffic in Arms Regulations (ITAR) found within AECA, it is illegal to export any item found on the United States Munitions List (USML) without specific licensing or approval from the U.S. Department of State. Additionally, previous invoices from Ammunitionstore.com indicated that the defendant had purchased other items of interest that were sent to Douglas, Arizona.

On July 18, 2017, the defendant purchased four units of .308, 7.62x51 Ammunition 145gr Full Metal Jacket (Wolf MFG) 100 Rounds Linked for M60 from Ammunitionstore.com. This made a total of 400 rounds of .308 ammunition for a M60 Machine Gun. The M60 is a gas-operated, air-cooled, belt-fed, automatic machine gun that fires from the open-bolt position. It has a cyclic rate of fire of around 500–650 rounds per minute (RPM). Ammunition is usually fed into the weapon from a 100-round bandolier containing a disintegrating, metallic split-link belt. The M60 Machine Gun averages in price from $6,000.00 to $8,000.00 dollars and is available on the United States open market in a semi-automatic version. Additionally on this invoice, the defendant purchased and received four units of .308 7.62x51 Starter Tabs for M60 Machine Gun Belts. This piece helps feed the initial round into the linking machine to link the links together into a belt that averages approximately 100 rounds per belt. Finally, on this same invoice, the defendant purchased and received a .308 7.62x51 Ammunition Belt Linker for a M60 Machine Gun. This item automates the process of assembling the links and ammunition into a belt that averages 100 rounds

per belt. This invoice indicates that the defendant had purchased all parts and apparatus necessary to make 100 round .308 belts for a M60 Machine Gun.

On August 6, 2017, the defendant purchased and received one unit of .308, 7.62x51 M13 Links (ALK) for a M60 Machine Gun (1000 Count Unit) from Ammunitionstore.com. The .308 caliber links are the pieces that link to each other allowing the weapon to have a consistent feed of ammunition. The links are connected to each other in long belts utilizing the .308 caliber bullet. The belts are then loaded into ammunition canisters in average amounts of 100 bullets, utilizing 100 links to make the belt. This would allow the defendant to assemble 10 additional belts, each containing 100, .308 bullets for the M60 Machine Gun.

Furthermore, the defendant utilized other individuals to buy weapons on his behalf; specifically the defendant recruited and used both his co-defendants to do such acts. Alcohol, Tabaco, Firearms and Explosives (ATF) Firearms Transaction Record Form 4473, dated October 21st, 2017, indicated that DAVIDSON, the defendant's wife, purchased a Glock 17, .9mm caliber pistol bearing serial number BCNX776 from Trail Boss Guns and Gear located at 124 Fry Blvd in Sierra Vista, Arizona.

Additionally, ATF Firearms Transaction Record Form 4473, dated October 26th, 2017, showed that DAVIDSON purchased two pistols from Kings Armory located at 125 East Fry Blvd in Sierra Vista, Arizona. The first weapon is a KelTec, CNC Industries, Inc., PMR-30, .22 caliber pistol bearing serial number WWLB47. The second weapon purchased by DAVIDSON was a Beretta, Pietro S.P.A 92, .9mm caliber pistol bearing serial number M86646Z. Finally, according to ATF Firearms Transaction Record Form 4473, dated November 21st, 2017, DAVIDSON, purchased a Remington 783, .270 caliber rifle bearing serial number RA16260A from Kings Armory located at 125 East Fry Blvd in Sierra Vista, Arizona. As outlined in the PSR, the defendant also recruited Rossany GRACIA to purchase firearms.

On December 8, 2017, Special Agents from HSI Douglas and Task Force Officers with the ATF conducted surveillance of the defendant's residence, awaiting the arrival of the FedEx truck delivering the box shipped from Ammunitionstore.com. At approximately 1:37 PM, the defendant was observed arriving in his blue Chevrolet Pick-up truck, walking up to the FedEx truck that was

stationary at a residence and speaking to the FedEx employee. Special Agents observed the FedEx employee hand the defendant the brown cardboard box with a single strip of black 3-inch tape wrapped around the exterior containing the .50 caliber BMG links.

At approximately 3:20 PM, the defendant, the sole occupant of the blue Chevrolet Pick-up truck, approached the final Customs and Border Protection (CBP) inspection point before entering the Country of Mexico. CBP Officers asked the defendant if he had any weapons, ammunition or money to declare before leaving the United States. The defendant answered that he did not have anything to declare.  CBP Officers referred the defendant and the blue Chevrolet Pick-up truck for further outbound inspection. Upon further inspection, CBP Officers found four (4) bags of the .50 Caliber BMG M2 links in black bags concealed under the bed liner of the blue Chevrolet Pick-up truck. CBP Officers also found one (1) additional package of .50 Caliber BMG M2 links in a black bag inside of a tool bag in the main cab of the blue Chevrolet Pick-up truck, for a total of 500, .50 Caliber BMG M2 links. Additional investigation revealed that the defendant did not have any of the above ammunition or the various firearms purchased by his co-defendants at his residence.  A search warrant executed on the defendant's phone revealed photos of the defendant with at least two of the weapons in Mexico.

On January 8, 2018, SA Edwards along with ATF SA Kent Owens were reviewing the forensic analysis of the defendant's phone at the ATF Office in Sierra Vista, Arizona. During the review, SA Edwards noticed numerous photos depicting child pornography.

Agents obtained an additional search warrant related to possible child pornography offenses on January 17, 2018.  During the search of the defendant's cellular telephone approximately 26 pictures and three (3) videos depicting child pornography were found. The pictures and videos appear to be of the same female child and the same adult female as those observed in the original photos.

Agents were able to find numerous non-child pornography photos of the female child and adult female in the cell phone extraction of the defendant's phone. Many of the photos had a file path indicating the photos had been received or sent using the WhatsApp messenger service. Upon opening the WhatsApp messenger application on the defendant's cell phone, agents located a

WhatsApp contact of "Zdl". When the "Zdl" contact was opened, law enforcement found multiple profile pictures associated with that specific contact. Those profile pictures matched the photos found in the cell phone extraction of the female child and adult female. Also attached in the "Zdl" contact profile was an area listed as "About and phone number." The section contained a kissing emoji, followed by "te amo F. (Translation: I love F.)," and seven heart emoji's.  Agents were ultimately able to locate the perpetrator of the molestation, the victim's mother.  She was arrested by authorities in Mexico and has been sentenced to fifteen years in prison.  There are numerous photos contained within the defendant's cell phone extraction that indicate that the defendant and the child victim's mother once had or continue to have a sexual relationship.  That is, there are numerous pornographic photographs of the victim's mother that do not include the child victim.

The defendant was detained pending trial.  While detained, agents listened to the defendant's phone calls.  On April 11, 2018, the defendant called a woman with a Puerta Penasco Mexican phone number.  (Attach. A.) During that phone call, the woman states that "it was the grandmother of your daughter – Yes, [that's] why they arrested Diana." (*Id*.)  In response to the defendant's question "when?", the woman responds "Before Holy Week.  And they took away the girl.  The DIF has her." (*Id*.)

### III.    SENTENCING CONSIDERATIONS UNDER 18 U.S.C. SECTION 3553(a)

Although the U.S. Sentencing Guidelines are advisory, the Court still begins its analysis by properly calculating the applicable range the defendant faces under § 2G2.2. *See United States v. Booker*, 543 U.S. 220, 245 (2005).  As the Supreme Court noted, "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 41 (2007).  The Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice" and reflect "a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007.)  The Ninth Circuit pointed out in *United States v. Henderson*, 649 F.3d 955 (9th Cir. 2011), sentencing courts "must continue to consider the applicable (child pornography) Guidelines range as 'the starting point and the initial benchmark.'" *Id*. at 964 (quoting *Gall*, 552 U.S. at 49).  Moreover, while the Ninth Circuit in *Henderson* held that a court's disagreement with the

guidelines for policy reasons may be used as a reason to give a below-guidelines sentence, the Court also emphasized that a district court may "disregard the Guidelines only where it is 'reasonable' for a court to do so." *Id*. at 968 (Judge Callahan concurring, citing *U.S. v. Pepper*, 131 S.Ct 1229, 1252 (2011)).

Before this Court is a perfect example of a defendant who should receive a guideline sentence. In child pornography cases, a significant number of courts from across the country, including the Ninth Circuit, have upheld guideline sentences for child pornography cases as reasonable. *See United States v. Blinkinsop*, 606 F. 3d 1110 (9th Cir. 2010) (within-guidelines sentence of 97 months affirmed, with recognition that "when a district judge imposes a sentence within the Guidelines range, it is probable that the sentence is reasonable" and that a "sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case.") Following an analysis of the § 3553(a) factors, the government believes guideline sentence is appropriate and requests that this Court sentence the defendant within the correctly calculated guideline range.

### A. <u>Seriousness of the Offense and The Harm of Child Pornography</u>

Child pornography has a devastating impact on its victims. For that reason, punishment of these crimes is of great consequence. Despite some arguments that the sentencing guidelines in child pornography cases are too harsh, Congress has continually recognized the seriousness of the global trade in sexually explicit images of children by setting mandatory minimum sentences that reflect the harmfulness of the offense, provide just punishment, and hopefully, when imposed, to deter others from engaging in like conduct. In fact, the Sentencing Commission has recently examined the sentencing guidelines for child pornography offenses to address the arguments regarding the harshness of the guidelines. The amendments did not alter the defendant's guideline range and support the government's position that a guideline sentence is appropriate.

Although those who view child pornography are not responsible for the sexual abuse committed when the images were produced, they are no less culpable than the initial abuser when it comes to causing ongoing damage, not only to the child, but to the community at large. Each time one person takes pleasure in seeing a child being sexually violated, or discusses with others

their fantasies about committing violent acts against children, society becomes a slightly less civil place. The standard of normative behavior degrades and deviance becomes just a little less unacceptable.

This notion is reflected in *United States v. Boos*, 127 F.3d 1207, 1211 (9th Cir. 1997) wherein the Ninth Circuit determined that there is no difference between the production of child pornography and other child pornography crimes that cause the distribution of the images, as the "distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children. . . . [T]he materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation." *United States v. Boos*, 127 F.3d 1207, 1211 (9th Cir. 1997), quoting *New York v. Ferber*, 458 U.S. 747 (1982.)

> In *Ferber*, 458 U.S. 747 (1982), the Supreme Court noted:
> As one authority has explained: [P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography. Shouvlin, *Preventing the Sexual Exploitation of Children: A Model Act*, 17 Wake Forest L.Rev. 535, 545 (1981).

*Ferber*, 458 U.S. at 758. *See also* Schoettle, *Child Exploitation: A Study of Child Pornography*, 19 J.Am.Acad.Child Psychiatry 289, 292 (1980) ("[I]t is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotional repercussions"); *Note, Protection of Children from Use in Pornography: Toward Constitutional and Enforceable Legislation*, 12 U.Mich.J. Law Reform 295, 301 (1979) (interview with child psychiatrist: "The victim's knowledge of publication of the visual material increases the emotional and psychic harm suffered by the child"). *Id*. at 760.

Congress and the courts have recognized child exploitation crimes as extremely grave offenses. *United States v. Williams*, 553 U.S. 285 (2008) ("Child pornography harms and debases the most defenseless of our citizens."). These crimes, "at their core demand the sexual exploitation and abuse of children. Not only are children seriously harmed -- physically, emotionally, and mentally -- in the process of producing such pornography, but that harm is then exacerbated by the

circulation, often for years after the fact, of a graphic record of the child's exploitation and abuse." *United States v. Reingold*, 731 F.3d 204 (2nd Cir. 2014.)

Further, the defendant's conduct in this case was more egregious than that of other child pornography offenders. The defendant knew the child victim in this case and knew she was being sexually abused. Thankfully, the child has been rescued and the perpetrator of the recorded abuse sentenced to fifteen years in custody in Mexico.

The defendant is part of a community of deviant individuals who are involved in the sexual abuse of young children. The fact that the children suffer the sexual abuse in the first place is a horrible reality. By viewing, sharing and trading the digital record of these children's suffering, the defendant continued the exploitation for his own and others' gratification every time he viewed or exchanged these images. When these pictures are distributed over the internet, and when people such as defendant seek them out and create a demand for them, the victims are left unable to heal, haunted by the images for the rest of their lives. *United States v. Stevens*, 197 F.3d 1263, 1267 (9th Cir. 1999).

The harm of child pornography is even further exacerbated when one considers that this crime is one which is often used to facilitate new abuse and the production of new images, as was done in this case. Courts and Congress have recognized that defendants often use child pornography to show to other children as part of the grooming process in getting the children to believe that having sex with adults is acceptable. *United States v. Maxwell*, 386 F.3d 1042, 1065 n. 22 (11th Cir. 2004) (quoting Congress' findings that child pornography is often used as part of method of seducing other children into sexual activity). Moreover, Courts and researchers have consistently recognized that people who have an interest in child pornography often molest children.

In Seto, Cantor, and Blanchard, "*Child Pornography Offenses Are a Valid Diagnostic Indicator of Pedophilia*" Journal of Abnormal Psychology, 2006, Vol. 115, No. 3, pp. 610–615, the authors found that collectors of child pornography were 2.8 times more likely to be pedophiles than other offenders against children. They wrote, "Our results indicate that child pornography offending is a valid diagnostic indicator of pedophilia.... In fact, child pornography offenders,

regardless of whether they had a history of sexual offenses against child victims, were more likely to show a pedophilic pattern of sexual arousal than were a combined group of offenders against children." *Id.* at 613.  This research merely confirms the common sense notion that someone who collects pictures and videos of children engaged in sexual activity is likely to be sexually aroused by such images.

### B. Child Pornography Offenders Often Are Child Sexual Abusers

The research goes beyond finding that people who collect the images of the sexual abuse of children are sexually aroused by them, however.   The most recent study to address this was published in the Journal of Sexual Aggression in 2014 and provides yet more proof that those who collect child pornography pose a very real danger to children.  In Bourke *et. al.* (2014): "*The use of tactical polygraph with sex offenders*" Journal of Sexual Aggression: An international, interdisciplinary forum for research, theory and practice, DOI:10.1080/13552600.2014.886729, the authors compiled the findings from three different federal agencies' use of tactical polygraphs with men under investigation for non-contact child pornography offenses.  The polygraphs were administered to a total of 127 suspects on the day of, or within 5 days of, the execution of a search warrant for child pornography at their residences.   None of the men had any known history of hands-on sexual abuse, and prior to the polygraph, only 4.7% (6 men) admitted to having committed a hands-on sexual offense against a child in the past.  After a tactical polygraph, an additional 52.8% (67 additional men) of participants admitted to having committed sexual abuse of a child.  All told, **57.5% of the 127 men admitted to already having sexually abused a child**, with 10 of the participants admitting to actively victimizing a child at the time of the polygraph.[1]

The conclusions in the recent Bourke study are very much in line with other research.  In Seto, Hanson, & Babchishin, "*Contact Sexual Offending by Men with Online Sexual Offenses*" Sexual Abuse: A Journal of Research and Treatment 23(1), 124-145, December 2010, the authors conducted a meta-analysis of 24 studies of online sexual offenders. They found that, if the only indicator one relied upon was arrests or convictions, the number of these men who were involved

---

[1] As a result of the admissions made during the post-polygraph interviews, a total of 282 victims were disclosed, and 97 victims who were still minors were identified by name.

in contact offenses with children was low – generally less than 20%. However, when studies used polygraph testing, or some other means to insure honest, self-reporting (such as anonymity or immunity from prosecution as part of a treatment program), the numbers were radically different. The studies with these types of validation determined that **fifty-five percent** of the men whose only charged offense was the receipt and possession of child pornography admitted to contact offenses against children. The *Seto* study was based upon many studies, but its results have been confirmed by other independent studies as well. In Buschman, Wilcox, Krapohl, Oelrich, & Hackett, "*Cybersex Offender Risk Assessment. An Explorative Study*" Journal of Sexual Aggression, July 2010, Vol. 16, No.2, pp. 197-209, the study subjects were again limited to individuals whose only offense was possession of child pornography. As in the Seto research, fifty-five percent of the subjects in that study, when polygraphed, admitted to contact offenses with children.[2] Here, the defendant did not just access and possess child pornography. He was actively engaged in conversations over the internet about sexually abusing children. (PSR ¶¶ 3-4.)

### C. Recidivism is Difficult to Assess and Vastly Under-Estimated

Moreover, this Court should give very limited credit to any argument that the defendant has a low rate of recidivism. Even the defendant's own evaluator recognized this, consistently qualifying his conclusions regarding the defendant's risk factors. Further, as the government will

---

[2] Another published study suggests the rate of cross-over between child pornography offenders and hands-on offenders is even higher. "*The 'Butner Study' Redux: A Report on the Incidence of Hands on Child Victimization by Child Pornography Offenders*," Bourke and Hernandez, 24 J.Fam.Viol. 183-191 (2009). That study focused on 155 offenders enrolled in the Butner Sex Offender Treatment Program, all of whom had been convicted of possession, distribution, or receipt of child pornography. Of these 155, 115 had no documented acts of hands-on child sex abuse at the time of their sentencing. When the researchers sought to determine to what extent this reflected the real danger presented by these offenders, what they learned was alarming. After treatment, including polygraphs, 91 of those 115 (over 79%) who had no known history of hands-on victims ultimately admitted having engaged in hands-on sexual abuse of children. Thus, after treatment, 85% of the total sample of 155 men convicted of child pornography offenses revealed past hands-on behavior against children. The authors also concluded that for the vast majority of subjects in their sample, internet-based child pornography offense was an adjunctive behavior, that is, "their collecting and trading behaviors were simply behavioral manifestations of a larger, more pervasive, and enduring paraphilic lifestyle." *Id.,* at 188. While this study has been recently criticized as an "outlier" and subject to some questions regarding the motivations for the large number of self-disclosures, one of the authors addressed these concerns in detail via a submission to the U.S. Sentencing Commission.

discuss at sentencing, the defendant withheld crucial information from the evaluator, making his conclusions unsupported.

Further, the problem with relying on recidivism rates as an indicator of future risk is that the statistics depend on crimes being reported and successfully prosecuted.  The vast majority of sex offenses against children go unreported, however. *See* London, Bruck, Ceci and Schuman, *Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Ways that Children Tell?*, Journal of Psychology, Public Policy, and Law, Vol. 11, No. 1, p. 194 (2005) (reviewing numerous studies and concluding "[t]he evidence indicates that the majority of abused children do not reveal abuse during childhood."). If the Penn State scandal taught us anything it was that even educated adults who witness child sexual abuse, or hear a first-person account of it from a reputable source, can be reticent to report the crime.  Thus, low recidivism numbers based upon arrests and convictions should be expected.  Further, on-line sex offenders are often at the cutting edge of technology designed to create anonymity, making arrest and conviction rates even lower.

However, when offenders are subject to a polygraph examination, or are assured that their admissions will not result in further prosecution, the number of admissions consistently jumps to more than half.  As the Seventh Circuit's Judge Posner noted in *United States v. Garthus*, 652 F.3d 715, 720 (7th Cir. 2011), "We need evidence-driven law just as we need evidence-driven medicine. Statistical analysis of sex crimes has shown that the best predictor of recidivism is not deportment at an interview but sexual interest in children." *Id*. at 720 (citations omitted.)  Those who collect or view images of children subject to sexual abuse find sexual stimulation in those images.  It should not come as a surprise to find that a large number of them have acted upon those impulses.[3]

As Judge Posner has explained:
> Statistical analysis of sex crimes has shown that the best predictor of recidivism is
> not deportment at an interview but sexual interest in children. R. Karl Hanson,

---

[3] Because most studies relating to recidivism pertain to "hands-on" offenses, recidivism rates for re-offense by collecting or viewing child pornography are less of a known quantity.  However, common sense dictates that re-offense is more likely to occur because it is easier to achieve in the privacy of one's home, simply by turning to a computer or one of many other devices with access to the Internet; such re-offense is also arguably harder to detect.  Moreover, although "possession-only" offenses do not involve the challenge of obtaining a child, the children in the pictures are real, and are continually violated by people who collect, trade, and use images of their sexual abuse for gratification.

- 11 -

> Kelley E. Morton & Andrew J.R. Harris, "*Sexual Offender Recidivism Risk: What We Know and What We Need to Know*," 989 Annals of the N.Y. Academy of Sciences 154, 157 (2003) (tab.1).

*United States v. Garthus*, 652 F.3d 715, 720 (7th Cir. 2011) (emphasis added).

### III. DEFENDANT'S ARGUMENTS FOR VARIANCE

The defendant will undoubtedly requested a variance. The defendant also argues that he poses no risk to the public at large because he has never offended before and he promises never to offend again. When it comes to child exploitation crimes, though, it is not always wise to take defendants at their word, because the majority of sexual assaults are never reported to authorities. Understanding the extremely low report rates for sex crimes is important to the instant case, because it provides some context for the defendant's plea for a lenient sentence. While a clean criminal record is encouraging, it proves only that the defendant has not previously been arrested or convicted, and nothing more. The existence of mitigating factors does not change the fact that the defendant actively participated in the market for images of child rape, helping create additional images and videos for like-minded individuals. Further, but for the defendant's involvement in illegally exporting firearms and ammunition to Mexico, it is doubtful that his child exploitation activities would have been discovered by law enforcement.

### IV. CONCLUSION

The defendant in the instant case has been convicted of both an extremely serious gun offenses as well as a child pornography offense. He was not offended by those pictures nor with providing ammunition and guns to individuals in Mexico. The United States recommends that this Court, in determining a sentence, give consideration to several facets of this case. First, the defendant, despite claims to the contrary, does demonstrate a sexual interest in children. The forensic examination located numerous images of children victims.

Further, although the defendant may have the best intention to refrain from ever again seeking out child pornography, it is important to make sure that any sentence imposed is sufficient to reinforce that objective. The sentence must also be sufficient to deter others from engaging in similar conduct, and to demonstrate that the justice system understands the damaging effect child pornography crimes have on the entire community.

For all of the foregoing reasons, as well as the information contained in the PSR and information to be presented and discussed at sentencing in this matter, the government requests that this Court sentence the defendant to the terms of incarceration set forth in the PSR.

Respectfully submitted this 29th day of March, 2019.

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*s/Erica L. Seger*

ERICA L. SEGER
Assistant U.S. Attorney

A copy of the foregoing served by electronic
or other means this 29th day of March, 2019, to:

U.S. Probation Officer Katia Cook
Probation Office-Tucson Division

Jay Sagar, Esq.